IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

     Plaintiff-Respondent,

vs.                             Civ. No. 03-172 MV/ACT
                                     Cr. 00-1341 MV

EMMANUEL N. OHIRI,

     Defendant-Movant.

## MAGISTRATE JUDGE'S PROPOSED FINDINGS
## AND RECOMMENDED DISPOSITION

**THIS MATTER** is before the Court on remand from the Tenth Circuit Court of Appeals,

*United States v. Ohiri*, 133 Fed. Appx. 555 (10th Cir. 2005).  The Tenth Circuit reversed the District

Court's order denying Ohiri's motion to amend his § 2255 petition.  On October 3, 2005, Ohiri filed

his Amended Motion and Memorandum in Support Pursuant to 28 U.S.C. § 2255 ("Amended

Motion"). [Docket No. 24.] The United States filed is Answer on November 29, 2005. [Docket No.

26.]  Having considered the arguments of the parties, the `record, relevant law and being fully

advised, the Court finds that the amended Motion should be denied.  Because the issues are resolved

on the pleadings and the record established conclusively that Ohiri is not entitled to relief, an

evidentiary hearing is not necessary.  28 U.S.C. § 2255; *Trice v. Ward*, 196 F.3d 1151, 1159 (10th

Cir. 1999), *cert. denied*, 531 U.S. 835 (2000).

1

**Factual and procedural background**.

On October 4, 2005, a federal grand jury returned a twenty-five count indictment charging General Waste Corporation ("GWC"), Emmanuel N. Ohiri and John Thomas Morris ("Morris") with conspiracy to transport, store, and dispose of hazardous waste in violation of the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. §§ 6928(d)(1), (d)(2)(A), (d)(3), (d)(4), and (d)(5), as well as substantive violations of the latter four sections and aiding and abetting, in violation of 18 U.S.C. § 2.  GWC was "a New Mexico solid waste management business licensed to remove hazardous waste from generating facilities and transport it to final disposal facilities."  *United States v. Morris*, 85 Fed. App. 117, 119 (10th Cir. 2003).  Ohiri was GWC's chief executive officer.  Morris was GWC's  operations manager from July 1997 to July 1998; his responsibilities entailed oversight of the hazardous waste activities, construction debris disposal and sales.  *Id.* at 119, n.2.

On March 20, 2001, Morris pled guilty to three counts of making false material statements on hazardous waste manifests.  The plea agreement provided that Morris would cooperate with the government, and that if he cooperated in compliance with the plea agreement, the United States would have the discretion to move for a downward departure pursuant to the United States Sentencing Guidelines ("USSG") 5K1.1.

On February 13, 2002, the grand jury returned a twenty-six count superceding indictment against GWC, Ohiri and Morris which again accused them of conspiracy to transport, store, and dispose of hazardous water, and of illegally transporting and storing hazardous waste in violation of RCRA, and aiding and abetting.  On March 5, 2002, Ohiri and GWC pled guilty to three counts of illegally storing hazardous waste.  On December 18 and 19, 2002, the Court held a sentencing hearing

for all three Defendants, and Ohiri was present throughout all proceedings.  The government did not file a motion for downward departure on Morris' behalf.  The Court sentenced Morris to three years probation.[1]

As permitted by Ohiri's plea agreement, the government introduced evidence at Ohiri's sentencing hearing on two contested issues:  whether he obstructed justice and whether he was a leader or organizer in the criminal offense.  In taking evidence and testimony, the Court read aloud Morris' Acceptance of Responsibility Statement ("Statement").  This statement was provided to the probation office for inclusion in Morris' presentence report.  *Ohiri*, 133 Fed. Appx at 557.  The government did not provide this statement to Ohiri or his attorney, John Cline ("Cline").  In his Statement, Morris repeated the following statement he had previously made to the EPA in 1999:

> The first two weeks that I joined GWC, Manny Ohiri instructed me to identify, segregate and label miscellaneous hazardous waste containers.  Those containers had been accumulated by GWC waste management activities, and stored in GWC warehouse prior to my arrival....I do not know how long the regulated material GWC accumulated has been in storage prior to my employment.  My participation included recreating false waste manifests for proper off-site disposal of the waste GWC had accumulated prior to my employment.  Manny Ohiri was aware of this activity.

*Id*.

The remainder of his Statement is as follows:

> I was employed at General Waste Corporation from July of '97 to July of 1998.  My title was operations manager.  My responsibilities entailed oversight of the hazardous waste activities, construction debris disposals, and sales.
> The first two weeks that I joined GWC, Manny Ohiri instructed me to identify, segregate, and label miscellaneous hazardous waste containers.  Those containers had been accumulated by GWC waste management activities, and stored in GWC warehouse prior

---

[1]The United States appealed Morris' sentence and the Tenth Circuit Court of Appeals reversed and remanded for re-sentencing.  *Morris*, 85 Fed. Appx. at 118.  On remand, the District Court sentenced Morris to 9 months in prison, followed by one year of supervised release.

to my arrival.

The materials included dry cleaning solvents, hydrocarbon-contaminated soil, medical waste, and other hazardous waste materials. Our goals was to profile the waste for the – for proper off-site shipment into a permitted disposal facility.

I do not know how long the regulated material GWC accumulated had been in storage prior to my employment. My participation included recreating false waste manifests for proper off-site disposal of the waste GWC had accumulated prior to my employment.

Manny Ohiri was aware of this activity. Once the waste in the warehouse was organized, I started to make sales contacts with hazardous waste accounts I had managed prior to my employment with GWC. My previous employer, Envirosolve Southwest, Incorporated, had an authorization granted by the State of New Mexico to store hazardous waste, up to 180 days, received from a conditionally-exempt small-quantity waste generator. Without this type of authorization, a waste management transporter could only store the waste for no more than ten days.

I personally made the decision, of my own accord, to operate GWC as if we were authorized as a 180-day storage and accumulation facility. I created uniform hazardous waste shipping manifests for GWC as the receiving facility.

I then remanifested the waste containers, and had GWC designated as a generator for out-bound waste disposal. I intentionally did this for building or aggregating larger outbound shipments [for] economical reasons....

Manny Ohiri was not informed of my waste management strategy and techniques in this particular case. For economical benefits and to increase profit margins related to the account, I would consolidate partial waste containers, mixing waste from multiple CESQG, reducing outbound disposal container volume. I did this on my own accord, and Manny Ohiri was not informed of this strategy.

In order to maintain my waste accounts and integrity, I would change dates on various small quantity generator manifests, due to the waste facility non-approval status. I would pick up waste without obtaining disposal facility prior approval, and would hold the waste over an extended amount of time, until the approval was in place.

I had recreated waste manifests and forged signatures to be in compliance, and to elude the waste generator and disposal facility. Manny Ohiri was not informed of this activity.

I understand and regret that my waste management techniques were wrong in these particular instances. I failed to comply with the Code of Federal Regulations regarding hazardous waste management. I took advantage of the system for economic gain, and to pacify my clients and employer, which I regret.

Transcript of Proceedings, Sentencing Hearing, December 19, 2002 at 8-11.


The presentation of evidence at the sentencing hearing was concluded on December 18, 2002.

On December 19, 2002, after hearing oral argument, the Court found that Ohiri engaged in the

4

obstruction of justice and also was a leader and organizer in the offense. *United States v. Ohiri,* 242 F. Supp. 2d 1038 (D.N.M.2003). The Court sentenced Ohiri to fifteen months in prison, three years supervised release, and ordered him to pay various amounts in fines and restitution.

Judgment was entered on December 26, 2002. Cline withdrew as counsel and Ohiri obtained representation from new counsel, Ray Twohig ("Twohig"). Twohig filed a timely Motion for a New Trial, a New Sentencing, or a Correction of Sentence. The Court denied Ohiri's Motion on May 14, 2003. [Criminal Docket No. 158.] On February 4, 2003, Ohiri filed a Motion Pursuant to U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence [Criminal Docket No. 150]. On August 4, 2003, the Magistrate Judge's Proposed Findings and Recommended Disposition were filed. [Civil Docket No. 8.] Twohig moved to withdraw and Ohiri filed objections to the Proposed Findings and Recommendations and moved to amend his petition. [Civil Docket No. 10.] The Court denied Ohiri's motion to amend [Civil Docket No. 12] and adopted the Magistrate Judge's Proposed Findings and Recommended Disposition [Civil Docket No. 13]. Ohiri filed a timely notice of appeal. [Civil Docket No. 14.] The Tenth Circuit Court of Appeals reversed the Court's ruling denying Ohiri's motion to amend. On remand, the Court entered an order permitting Ohiri to file his amended petition. [Civil Docket No. 20.]

In Ohiri's Amended Motion, Ohiri requests that he be permitted to withdraw his plea on the grounds that it was not knowing and voluntary because "(1) the United States failed to provide to him material, exculpatory evidence before his plea which was exculpatory and imperiled the testimony of the key witness against him in the case; and (2) trial counsel for Mr. Ohiri rendered ineffective assistance due to a financial conflict of interest and thereby failed to adequately investigate the case, to discover the exculpatory statement, to hire experts and to conduct independent testing on the

alleged hazardous substances." Amended Motion, Docket No. 24 at 6-7.

**Discussion.**

    A.    *Validity of Guilty Plea.*

"[A] voluntary and intelligent plea of guilty made by an accused person who has been advised by competent counsel, may not be collaterally attacked." *Mabry v. Johnson*, 467 U.S. 504, 508 (1984). Having pleaded guilty, Ohiri's only avenues for challenging his conviction are to claim that (1) he did not voluntarily or intelligently enter his plea and (2) he received ineffective assistance of counsel before entering the plea. *Id*. Ohiri contends that his plea was not voluntary and intelligent because the government suppressed material, exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). The Tenth Circuit has held that in limited circumstances, a defendant who has pled guilty may challenge the voluntariness of the plea based on the government's failure to produce exculpatory material as required under *Brady*. *United States v. Wright*, 32 F.3d 491, 496 (10th Cir. 1994) (also holding that even if a Brady violation is established, "habeas relief would clearly be the exception.") The evidence that Ohiri claims the government suppressed was Morris' Statement, as discussed above.

In a criminal case, the prosecution has a duty to disclose exculpatory evidence: evidence is exculpatory under *Brady* if it is generally favorable to the accused's defense or is impeachment evidence. S*mith v. Sec'y of New Mexico Dep't of Corr.*, 50 F.3d 801, 825-26 (10th Cir. 1995). To prove a *Brady* violation, Ohiri must establish that "(1) the prosecutor suppressed evidence; (2) the evidence was favorable to the defendant as exculpatory...evidence; and (3) the evidence was material." *United States v. Walters*, 269 F.3d 1207, 1214 (10th Cir. 2001). Generally, evidence is material if there is a reasonable probability that, had the evidence been disclosed to the defense, the

result of the proceedings would have been different.  *Knighton v. Mullin,* 293 F.3d 1172 (10th Cir. 2002).  Thus, Ohiri must show that he would not have entered a guilty plea and would have insisted on going to trial had he known of Morris' Statement.  *Walters*, 269 F.3d at 1214.  "Assessment of that question involves an objective inquiry that asks not what a particular defendant would do but rather what is the likely persuasiveness of the withheld information."  *Id*. at 1215.

In its remand decision, the Tenth Circuit Court did not address whether the government was required to produce Morris' Statement prior to Ohiri's sentencing.  Ohiri asserts that the government should have sought permission from the Court to disclose the Statement to Ohiri.  However, several of the cases on which Ohiri relies suggest that the defendant bears the burden of moving the court for disclosure of material contained in a co-defendant's presentence report.  *E.g.*,*United States v. Moore*, 949 F.2d 68 (2nd Cir. 1991); *United States v. Devore,* 839 F.2d 1330, 1332-33 (8th Cir. 1988).  In the remand decision the Tenth Circuit concluded that the trial court's determination that Morris' Statement was not exculpatory was "questionable and must be re-examined based on arguments Ohiri makes in his amended motion."  *Ohiri*, 133 Fed. Appx. at 563.  In analyzing Ohiri's Amended Motion, the evidence at issue and the Counts to which Ohiri pled, the undersigned Magistrate Judge recommended finding is that the evidence is not exculpatory and not material.

Count 21.

Count 21 of the indictment charged GWC, Ohiri and Morris with knowingly storing 11,000 pounds of hazardous waste from the Four Corners Drilling Company from February 13, 1998, until May 18, 1999, and aiding and abetting that storage.  In his amended motion, Ohiri asserts that Morris handled this transaction alone.  Ohiri attached to his amended Motion a draft letter ("draft letter") dated December 16, 2002 to Judge Vazquez.  Ohiri asserts in an affidavit that this draft letter was not

given to Judge Vazquez.   Amended Motion, Exhibit B at ¶ 66.

In addressing Count 21,  Ohiri stated in the draft letter that "Tom Morris handled this transaction alone." and that when Ohiri "found out about the waste stream, I disposed of it immediately...." Amended Motion,  Exhibit D.  However, the evidence demonstrates this statement is not true.  The government's evidence shows that Morris picked up this waste on or about February 13, 1998.  Response,  Exhibit 45.  Morris stopped working for GWC in July of 1998.  The waste was discovered by law enforcement officials on GWC's property on November 13, 1998.  Transcript of Proceedings, Sentencing Hearing, December 18, 2002 at 200.  When asked by the EPA enforcement officer whether the hazardous waste labels accurately depicted what was in the drums, Ohiri did not say anything.  *Id.* at 198.  When asked if there was any hazardous waste at this site, Ohiri told the EPA enforcement officer there was no hazardous waste.  *Id.*  Ohiri disposed of the waste on May 18, 1999, well after knowing of its existence.  Response, Exhibit 51-A.

Ohiri contends in this Amended Motion that:

After Morris had received 50% of his commission, he hid the waste in an abandoned, obsolete GWC truck parked in the Nikanda Yard, two blocks from the main GWC facility....Unbeknownst to me, Mr. Morris left the waste hidden in the truck.  This waste was discovered by EPA inspectors on November 13, 1998.  I personally did not know of this waste until several weeks later, when I gave Pete Domenici, Jr., GWC's counsel, a tour of the facility.

Amended Motion, Exhibit B at ¶ 26.

Thus, accepting what Ohiri says is true in this amended Motion, Ohiri illegally stored the waste for at least four months.  He acknowledges that he was aware of the waste by the end of 1998.  Ohiri was not authorized to hold the waste for more then ten days.  He disposed of it in May of 1999, almost a year after Morris left GWC.  Morris' statement does not exonerate Ohiri with respect to the hazardous waste which is the foundation of Count 21 of the indictment.

Count 23.

Count 23 of the indictment charges GWC, Ohiri and Morris with knowingly storing 225 pounds of hazardous waste from Giant Refining Company from July 17, 1998 until October 15, 1998, and aiding and abetting that storage.

In Ohiri's draft letter, Ohiri stated that "Morris initiated this transaction and it was completed by GWC employees without my knowledge....When I found out about it, I arranged for the generator [Giant Refinery] to come to GWC and receive their waste stream from GWC."  Amended Motion, Exhibit D at 2.  In his affidavit attached to the amended motion, Ohiri asserts "that Lucas Maestas had acted under Mr. Morris's instructions to pick up waste stream from the Giant Refinery....The waste was abandoned by GWC by Mr. Morris without my knowledge or consent.  When the waste was discovered, it was returned to the generator."  Amended Motion,  Exhibit B at ¶ 27.

The evidence in this case does not support Ohiri's statements. Lucas Maestas, a GWC employee had picked up the waste on July 17, 1998. Response, Exhibit 52.  Representatives from Giant Refinery went to GWC on October 14, 1998 to look for the waste because it had never received a manifest showing final disposal of the waste.  Response, Exhibit 1 at ¶ 21-22.  Ohiri was present at that time. *Id*.  The containers had hazardous waste labels on them showing that the waste had been picked up on July17, 1998.  Response, Exhibits. 53-A to 53-B.  The representatives from Giant Refinery removed the waste from GWC's warehouse on October 15, 1998.  Response, Exhibit 54.

Ohiri offers no evidence to support his contentions that Morris directed the pick up of the Giant Refinery waste and its concealment at GWC's warehouse.  Rather Ohiri offers evidence to the contrary as he asserts in his affidavit that Morris fled to California on July 11, 1998, six days before

this waste came into the hands of GWC.  Furthermore, Morris'statement that Ohiri was not informed of his hazardous waste management strategies is not relevant and is not exculpatory to the charges in Count 23.

Count 25.

Count 25 charged GWC and Ohiri with knowingly storing 183 pounds of hazardous waste from May 28, 1999, until on or about July 27, 2001, and aiding and abetting that storage.  In his draft letter Ohiri's claims he is innocent.  Ohiri states that "Tom Morris initiated and completed this transaction alone."   Amended Motion, Exhibit D.  However, he also states in that letter that he became aware of Morris' hazardous waste management strategies with respect to iina'ba by March 9, 1998.  These two statements are inconsistent.  As stated in the indictment, GWC stored the waste at issue beginning on May 28, 1999, long after Ohiri states he became aware of Morris' hazardous waste management strategies.

Moreover, the evidence in this matter does not support Ohiri's claim of innocence.  Ohiri rented the trailer in which the waste was found on May 27, 1999, ten months after Morris had left GWC.  Response, Exhibit. 55.  In addition, Morris' Statement that Ohiri initially was not informed of Morris' hazardous waste management strategies is not relevant to the charges in Count 25.

Thus, to summarize, Morris' Statement is not exculpatory nor is it material.  Morris' Statement pertains only to the period of time that Morris was working at GWC, which was from July 1997 to July 1998.  The facts underlying Counts 21, 23 and 25 involve, for the most part, illegal storage of hazardous waste after Morris left GWC.

Finally, the court notes that Ohiri admitted his guilt under penalty of perjury at his change of plea hearing.  Transcript of Proceedings, March 5, 2002, Tr. at 12, 30-31.  At the hearing, the Court

10

asked the Government to state the factual basis of Ohiri's plea. *Id*. at 27. The prosecutor stated:

> Your Honor, if this case were to go to trial, the United States would prove with competent evidence that General Waste Corporation was a company formed in 1994 for the specific purpose of providing services involving the handling, packaging, and transportation and final disposal of hazardous waste....
>
> Mr. Emmanuel Ohiri is the president and CEO and sole shareholder of General Waste Corporation, and General Waste Corporation obtained a hazardous waste permit - hazardous waste transportation permit from the EPA, but never sought or obtained any other permits or authorizations from either the State of New Mexico Environment Department or the EPA to store hazardous waste at his business sites or elsewhere.
>
> Operating from several locations on or near Edith Boulevard in Albuquerque, New Mexico, General Waste Corporation provided hazardous waste services, primarily transportation, to licensed disposal facilities out of the state.
>
> At various times, Mr. Ohiri and GWC knowingly stored RCRA-regulated hazardous wastes on GWC's properties[.] [T]his waste had been obtained from generators and manifested for disposal at an appropriately-licensed facility. However, Mr. Ohiri and General Waste caused the waste to be illegally stored for extended times on this property and elsewhere.
>
> Specifically, the United States would show that starting on or about February 13, 1998, GWC and Mr. Ohiri knowingly caused 11,000 pounds of what they knew to be hazardous waste from Four Corners Drilling Company to be stored for over a year on GWC's 5150 Edith Boulevard property where they knew they did not have a permit to store that waste.
>
> Starting on or about July 17, 1998, Mr. Ohiri, as president and CEO of General Waste, caused the transportation of 225 pounds of what they knew to be hazardous waste from Giant Refining Company to be transported to and stored on GWC's properly until on or about October 15, 1998.
>
> This hazardous waste was illegally stored on the property for a period of 75 days without permit for such storage. The waste was still being stored at GWC when representatives of Giant came to GWC to retrieve their hazardous waste so they could properly dispose of it.
>
> The United States would also show that from on or about...May 28, 1999, until or about July 27, 2001, General Waste and Mr. Emmanuel Ohiri did knowingly cause approximately 183 pounds of what they knew to be ignitable hazardous waste originally from Iina-ba', a Farming contractor, of hazardous material to be stored in a trailer owned by [Maloy] Storage in Albuquerque.

*Id*. at 27-29.

> THE COURT:       Mr. Ohiri, I need to have you tell me, sir, in your own words, what you did and what you were aware of during this time period as an individual and as a representative of the corporation that makes you guilty of these counts.
> I ask that question, sir, because I cannot accept a plea of guilty from someone that is not

11

guilty, and if you need to consult with your attorneys in order to answer this question, you may, of course, do so.

*Id.* at 29-30.

THE DEFENDANT:  Your Honor, I - I allowed hazardous waste to be stored a longer time than allowed by regulation.
THE COURT:          On your property?

THE DEFENDANT:  On my property yes.
THE COURT:          And you did so knowing what it was; that it would constitute hazardous waste, and that it was in violation of the law to store it?
THE DEFENDANT:  Yes, your Honor.
THE COURT:          All right.  Mr. Ohiri, you heard Mr. Winstead go over the precise details of all three counts.  Do you have any disagreement with the details as he described them?
THE DEFENDANT:  No, your Honor.

*Id.* at 30.

There is a "strong presumption of verity" attached to Ohiri's admissions of guilt at his change

of plea hearing.  *United States v. Hirsch*, 239 F.3d 221, 225 (2nd Cir. 2001).

For all the foregoing reasons, the Court finds that Ohiri's plea of guilty was voluntary and

intelligent and recommends that Ohiri's Amended Motion based on the validity of his guilty plea be

denied.

B.       *Assistance of Counsel.*

To prove ineffective assistance of counsel, Ohiri must show that his attorney's performance

was constitutionally inadequate and that his attorney's constitutionally ineffective performance

prejudiced him, i.e., caused him to plead guilty instead of going to trial.  *Hill v. Lockhart*, 474

U.S. 52, 59 (1985).  To demonstrate that his lawyer's professional performance was deficient,

Ohiri must show that Cline "made errors so serious that counsel was not functioning as the

'counsel' guaranteed the defendant by the Sixth Amendment."  *Strickland v. Washington*, 466

U.S. 668, 688 (1984).  Prejudice means that "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Id*. at 694.  A reasonable probability is a probability "sufficient to undermine confidence in the outcome."  *Id*.  If Ohiri fails to establish either incompetence or prejudice, his claim of ineffective assistance of counsel must fail.  *Id*. at 697, 700.

Ohiri contends that his inability to pay Cline's fees created a conflict of interest between him and Cline which caused Cline to advise him to plead guilty even though it was not in Ohiri's best interest to do so.  To prevail, Ohiri must prove that his financial debt to Cline created an actual conflict of interest and that the conflict adversely affected Cline's performance.  *Cuyler v. Sullivan*, 446 U.S. 335, 345 (1980); *United States v. Marrera*, 768 F.2d 201, 207 (7th Cir. 1985).  To prove an actual conflict of interest, Ohiri must show that Cline made a choice to advance his own financial interest to the detriment of Ohiri's interest.  *Marrera*, 768 F.2d at 207.

In support of his claim, Ohiri has attached a Declaration by Cline signed on June  26, 2003.  Although Cline states that he strongly recommended to Ohiri that he plead guilty, he states that he "made clear to [Ohiri] that the decision whether to plead guilty or go to trial was his to make."  Cline Declaration, Amended Motion, Exhibit A at ¶ 7.  When Ohiri told Cline he wanted to withdraw his plea, Cline "reiterated to him the reasons that, in my view, made it advisable for him to have entered the guilty plea in the first place," but he "told him that the decision whether to move to withdraw the plea was his to make."  *Id*. at ¶ 9.  It is important to note that Cline does not state in his Declaration that he believed Ohiri was innocent or that the Government could not prove beyond a reasonable doubt that Ohiri was guilty of the counts to which he pled guilty.

Cline states that he did not retain any experts in this matter "in substantial part because he

could not afford to do so." *Id*. at ¶ 5. Specifically, Cline states he did not retest the samples because of the cost. However, Ohiri presented no evidence that this testing would have helped Ohiri's defense. The Government asserts that Ohiri disposed of the waste described in Count 21 after he had it tested by Pinnacle Laboratories.  Response. Exhibit. 51-B.  As to Count 23 the Government asserts it did not test the waste described in Count 23 but rather relied on the generator's characterization of the waste as hazardous.  As to the waste described in Count 25, Ohiri offers no explanation as to why testing of the waste would help his defense.  Compare Amended Motion,  Exhibit B ¶¶ 38-40 with Response,  Exhibit 56.

Cline also states in his declaration that he "likely would have requested a continuance of the March 18 trial date to permit additional time to prepare for trial."  Cline Declaration, Amended Motion,  Exhibit A at ¶ 8.  He states that he had been involved in another trial between February 25 and 28, 2000, in Las Cruces and that trial and preparation for that trial "consumed a substantial amount of my time during February 2002."  *Id*. These facts do not demonstrate that Cline's performance was constitutionally inadequate or that Ohiri would have been prejudiced by a continuance.

Finally, a review of the record demonstrates that Cline spent substantial time defending Ohiri. He filed numerous motions including a Motion to Dismiss counts 1-7, 9-19, and 21-23 for lack of subject matter jurisdiction and for failure to charge an offense [Criminal Docket No. 17], a Motion to Dismiss count 25 for failure to charge an offense [Criminal Docket No. 20],  a Motion to Suppress Evidence [Criminal Docket No. 22] and a Motion for Severance [Criminal Docket No. 19].  Cline obtained a subpoena for documents to impeach Morris' credibility [Criminal Docket No. 69] and filed extensive objections to Ohiri's presentence report. [Criminal Docket No. 117].  A review of the

14

transcript of proceedings in the sentencing hearings showed extensive and effective cross-examination by Cline of the Government witnesses as well as presentation of thorough legal arguments. Transcript of Proceedings, Sentencing Hearing, December 18 and 19, 2002.

Ohiri alleges that Cline was ineffective because he did not request a recess after the Court read Morris' Statement so as to allow Ohiri time to consider if he wanted to withdraw his plea. As discussed above, Morris' statement was not exculpatory and not material to the Counts to which Ohiri pled. Thus, Ohiri cannot prove any prejudice as a result of this alleged error. Moreover, the record does not demonstrate that Ohiri wanted to withdraw his guilty plea or that he wanted a recess so that he could talk to his attorney. After Ohiri heard the Statement and before sentence was imposed, the Court invited Ohiri to speak. Transcript of Proceedings, Sentencing Hearing, December 19, 2002 at 34. Ohiri did not say anything concerning withdrawing his plea. He stated he was sorry for what he did and took "full responsibility as CEO of the company," and that he "should have prevented it, to make sure no chemicals were stored on site for longer than ten days...." *Id.* He concluded by asking for the Court's mercy. *Id.*

Furthermore, to prove prejudice, Ohiri must prove that he would have been permitted to withdraw his guilty plea. To withdraw his guilty plea Ohiri must "show a fair and just reason for requesting the withdrawal." Fed.R.Crim.P. 11(d)(2)(B). In demonstrating a "fair and just reason" the court considers the following factors:

> "(1) defendant's assertion of innocence; (2) resulting prejudice to the government; (3) defendant's delay in filing the withdrawal motion; (4) inconvenience to the court; (5) defendant's assistance of counsel; (6) knowledge and voluntariness of the plea; and (7) resulting waste of judicial resources."

*United States v. Graves*, 106 F.3d 342, 343 (10th Cir. 1997).

15

As discussed above, Ohiri's claims of innocence are not credible and the government's alleged *Brady* violation did not make Ohiri's guilty plea involuntary.  The undersigned Judge also notes that the Court found "Ohiri was "in charge, because this was [his] company."  Transcript of Hearing, Sentencing Proceedings, at 39.  The Court also found that Ohiri was "aware of what was going on, and ...[was] in a position to profit from taking the shortcuts that [he] took." *Id*.  The record simply does not demonstrate that Cline's failure to request a recess was incompetent or that Ohiri was prejudiced.

Finally, Ohiri is critical of the fact that Cline did not call any witnesses to testify in his defense at the sentencing hearing.  However, Ohiri has never identified any witnesses who would have been helpful at the sentencing hearing.  Amended Motion,. Exhibit B at ¶ 58.

For all the foregoing reasons, the undersigned Judge finds that Ohiri did not show that his financial debt to Cline caused an actual conflict of interest, nor did he demonstrate that any conflict adversely affected Clines' performance or that Cline's performance was constitutionally ineffective.  Accordingly, the Court recommended that Ohiri's ineffective assistance of counsel claim be denied.

## **RECOMMENDED DISPOSITION**

I recommend that amended §2255 petition be denied and this action be dismissed with prejudice.

Timely objections to the foregoing may be made pursuant to 28 U.S.C.§ 636(b)(1)(C). Within ten days after a party is served with a copy of these proposed findings and recommendations that party may, pursuant to § 636(b)(1)(C), file written objections to such proposed findings and recommendations with the Clerk of the United States District Court, 333 Lomas N.W., Albuquerque,

NM 87102.  A party must file any objections within the 10 (ten) day period allowed if that party wants to have appellate review of the proposed findings and recommendations.  If no objections are filed, no appellate review will be allowed.


_____
**ALAN C. TORGERSON**
**UNITED STATES MAGISTRATE JUDGE**